Jonathan D. Miller (Bar No. 220848)
jonathan@nshmlaw.com
Alison M. Bernal (Bar No. 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

*Additional counsel for Plaintiffs, and Defendant's counsel, listed on signature page.*

Attorneys for Plaintiffs, LUKE DAVIS, JULIAN VARGAS, AMERICAN COUNCIL OF THE BLIND, and the Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1-10, inclusive,

Defendants.

CASE NO.: 2:20-cv-00893-FMO-KS

**JOINT BRIEF CONCERNING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

[*Concurrently filed with Notice of Motion; Joint Appendix, including Local Rule 7-3 Declaration of Alison Bernal; Request for Judicial Notice; and [Proposed] Order*]

Hon. Fernando Olguin
Date: May 27, 2021
Ctrm: 6D
Time: 10:00 a.m.

TRIAL DATE: None set

# TABLE OF CONTENTS

I. INTRODUCTION ....................5
A. Plaintiffs' Introductory Statement ....................5
B. Defendant's Introductory Statement ....................5
II. STATEMENT OF FACTS ....................8
A. Plaintiffs' Statement of Facts ....................8
1. LabCorp's Business ....................8
2. Project Horizon ....................8
3. Plaintiffs Cannot Independently Use The Kiosks ....................14
a. Luke Davis ....................14
b. Julian Vargas ....................17
c. ACB Members ....................18
B. Defendant's Statement of Facts ....................20
1. Labcorp PSCs And The PSC Check-In Process ....................20
2. Plaintiffs' Testimony Regarding Visits To Labcorp PSCs ....................22
3. Plaintiffs' Experts ....................26
4. Defendant's Rebuttal Expert ....................28
III. ARGUMENT ....................29
A. Plaintiffs' Summary of the Argument ....................29
B. Defendant's Summary of the Argument ....................30
C. Class Requirements Of Rule 23(a) ....................32
1. Numerosity ....................32
a. Plaintiffs' argument on numerosity ....................32
b. Defendant's argument on numerosity ....................34
2. Commonality ....................36
a. Plaintiffs' argument on commonality ....................36
b. Defendant's argument on commonality ....................37

3. Typicality ..... 38

a. Plaintiffs' argument on typicality ..... 38

b. Defendant's argument on typicality ..... 39

4. Adequacy ..... 41

a. Plaintiffs' argument on adequacy ..... 41

b. Defendant's argument on adequacy ..... 42

D. Class Requirements of Rule 23(b)(2) for Injunctive Class ..... 43

1. Plaintiffs' argument on Rule 23(b)(2) requirements ..... 43

2. Defendant's argument on Rule 23(b)(2) requirements ..... 43

E. Class Requirements of Rule 23(b)(3) for California Minimum Statutory Damages Class ..... 45

1. Common questions of law and fact predominate over individual questions ..... 45

a. Plaintiffs' argument on predominance ..... 45

b. Defendant's argument on predominance ..... 47

2. Class certification is superior to other means of resolving this dispute ..... 50

a. Plaintiffs' argument on superiority ..... 50

2. Defendant's argument on superiority ..... 51

V. CONCLUSION ..... 53

a. Plaintiffs' Conclusion ..... 53

b. Defendant's Conclusion ..... 53

# TABLE OF AUTHORITIES

*Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)* ........................47, 50
*Antoninetti v. Chipotle Mexican Grill, Inc., No. 6–cv–2671 BTM, 2012 WL 3762440 at *5–6 & n.1 (S.D. Cal. Aug. 28, 2012)* .............48, 51,52
*Botosan v. Paul McNally Realty, 216 F.3d 827, 835 (9th Cir. 2000)* ...............32, 47
*Brooks v. Pressed Juicery, Inc., 336 F.R.D. 484, 493 (E.D. Cal. 2020)*.......47,49,50
*Brown v. Bd. of Educ. of Topeka, Shawnee Cty., Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)*.......................................................................5
*Celano v. Marriott Int'l, Inc., 242 F.R.D. 544, 550 (N.D. Cal. 2007)*.....................36
*Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)* .........................35
*Doran v. 7-Eleven, Inc., 509 F. App'x 647, 648 (9th Cir. 2013)* ............................47
*Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)* .....................35
*Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982)* ......................................40
*Green v. Borg–Warner Protective Servs. Corp., No. 95 CIV. 10419 (RPP), 1998 WL 17719, *3–4, (S.D.N.Y. Jan. 15, 1998)* ..............................36
*Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)* ...............42, 44, 46
*Hansberry v. Lee, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940)* .............42
*Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017)* ........................38, 46
*Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012)* .....................45
*Mielo v. Bob Evans Farms, Inc., No. CIV.A. 14-1036, 2015 WL 1299815, at *11 (W.D. Pa. Mar. 23, 2015)*............................42, 44
*Moeller v. Taco Bell Corp., No. C 2–5849 PJH, 2012 WL 3070863 at *5 (N.D. Cal. Jul. 26, 2012)* .....................................................32, 47, 48, 51, 52
*Molski v. Foley Estates Vineyard and Winery, LLC, 531 F.3d 1043, 1050 (9th Cir. 2008).)*.......................................................................5, 46
*National Federation of the Blind v. Target Corp., 582 F.Supp.2d 1185, 1199 (N.D. Cal. 2007)* .......................................................................32
*Nevarez v. Forty Niners Football Company, LLC, 326 F.R.D. 562, 576 (N.D. Cal. 2018).* .......................................................................34, 52
*Parson v. Ryan, 754 F.3d 657, 675 (9th Cir. 2014)* ..............................................37
*Probe v. State Teachers' Ret. Sys., 780 F.2d 776, 780 (9th Cir.1986)* ...................43
*Rivera v. Crema Coffee Co. LLC, 438 F. Supp. 3d 1068, 1076 (N.D. Cal. 2020)*..........................................................................................5
*Rodriguez v. Barrita, Inc., 10 F.Supp.3d 1062, 1085 (N.D. Cal. 2014)* ..................5
*TransUnion v. Ramirez (No. 20-297)* ..................................................................7, 41
*Vinole v. Countrywide Home Loans, 571 F.3d 935, 944-47 (9th Cir. 2009).*.........47
*Vondersaar v. Starbucks Corp., No. CV 12-05027 DDP AJWX, 2015 WL 629437, at *3 (C.D. Cal. Feb. 12, 2015)*.........................................31, 48
*Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360 (2011)*.............31, 36, 37,43, 44
*Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).* ...........7, 30, 43, 45
*Federal Rule of Evidence 702*...............................................................................36

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

### *A. Plaintiffs' Introductory Statement*

Plaintiffs institute this nationwide civil rights class action lawsuit to vindicate a long-settled, bedrock principle of American law: that "separate but equal" treatment is inherently unequal. *Rivera v. Crema Coffee Co. LLC*, 438 F. Supp. 3d 1068, 1076 (N.D. Cal. 2020) ("[t]he Court declines to endorse the "separate but equal" theory implied in defendants' proposed alternative method of access"), citing *Brown v. Bd. of Educ. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Rodriguez v. Barrita, Inc.*, 10 F.Supp.3d 1062, 1085 (N.D. Cal. 2014); and *Molski v. Foley Estates Vineyard and Winery, LLC*, 531 F.3d 1043, 1050 (9th Cir. 2008).

Here, the evidence demonstrates that defendant Laboratory Corporation of America Holdings ("LabCorp") discriminates systematically against legally blind customers such as lead plaintiffs Luke Davis and Julian Vargas – as well as thousands of other legally blind Americans – by offering a patient check-in system that has one set of features for the sighted, and a separate, lesser, and fundamentally unequal set of features for the legally blind.

### *B. Defendant's Introductory Statement*

Plaintiffs' rhetorical flourish aside, Labcorp has taken a reasonable, practical approach to ensure that patients with visual disabilities can check in at its patient service centers ("PSCs"). Historically, all patients checked-in with a Labcorp employee at the front desk. Starting in late 2017, Labcorp began installing kiosks, which provided an option for patients to check-in at an iPad kiosk. Because these kiosks would not be accessible to, or preferred by, all patients, Labcorp intentionally retained the option for all patients to check-in at the front desk, just as they always had done. To this day, approximately 25% of Labcorp's PSC patients check-in at the desk.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Despite the pending summary judgment motion that should eliminate Plaintiffs' individual claims,[1] Plaintiff Davis (a Pennsylvania resident), Plaintiff Vargas (a California resident), and Plaintiff American Counsel of the Blind ("ACB") (a Virginia-based organization) seek to certify two putative classes to pursue claims related to the optional check-in kiosks. **First**, Plaintiffs ask to represent a Rule 23(b)(2) nationwide class of legally blind persons "who were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to Labcorp's failure to make its e-check-in kiosks accessible to legally blind individuals"—a fail-safe class definition excluding from the class all legally blind persons who visited a PSC and who did not attempt to or want to check in with a kiosk. This class definition thus implicitly concedes that at least some population of legally blind persons are able to check in and obtain services at Labcorp facilities without impediment, through the front desk check in process (as many sighted persons do as well). There are significant problems with Plaintiffs' typicality to represent this class given clear testimony that at least some legally blind people prefer the auxiliary aid selected by Labcorp (front desk check in with a qualified reader). Further, the commonality of **remedy** required for a 23(b)(2) certification does not exist given that Plaintiffs' claimed preferred aids (screen reading, keyboard, and VoiceOver) would not render the kiosks accessible for self check-in by all legally blind persons, as their own expert admits.

**Second**, Plaintiff Vargas, the California resident, seeks to represent a subclass of legally blind persons who visited PSCs in California. Vargas asks for certification pursuant to Rule 23(b)(3) for statutory damages claims under California

---

[1] Competing summary judgment motions on Plaintiffs' individual accessibility claims are currently pending. Labcorp asserts that Plaintiffs were not denied access to the goods and services (laboratory testing services) offered at the PSC because it provided a desk check-in option with its employees acting as qualified readers and that summary judgment as to Plaintiffs should be entered for Labcorp.



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

statutes that permit recovery for certain ADA violations. Common issues, however, do not predominate so as to support Rule 23(b)(3) certification of the subclass, given the mini-trials that would be required to assess a class member's entitlement to statutory damages. The case law laid out in Labcorp's Rule 23(b)(3) section below is clear: to be entitled to minimum statutory damages of $4,000 (Unruh) or $1,000 (CDPA) per visit, each California class member must show how he or she was personally affected by the discrimination, and show that Labcorp denied them full and equal access. For this reason, federal courts deny certification of Unruh/CDPA class claims like Vargas's here, because common issues will not predominate and because class procedures are not manageable or superior given the extensive individualized inquiries. Further, Vargas has not shown numerosity or typicality required for certification of the Rule 23(b)(3) California subclass.

Thus, Plaintiffs' proposed classes do not meet the requirements for certification under the Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

And finally, in anticipation of the Supreme Court's decision in *TransUnion v. Ramirez* (No. 20-297) (oral argument held March 30, 2021), Labcorp hereby makes and preserves its argument that as to the 23(b)(3) class, each California subclass member's own individual standing to proceed with California statutory damages claims in federal court requires evidence of actual injury in order to support this court's Article III jurisdiction. This inquiry into standing, too, would be individualized given that the variations in staffing and kiosk availability at PSCs creates a wide range of check-in experiences that individual patients may have experienced. Thus, if (as is expected) the Supreme Court alters the current Ninth Circuit standards for class certification to require actual injury in a statutory damages class—not just for the named plaintiff, but for class members as well—that ruling would preclude certification of Plaintiffs' 23(b)(3) subclass on standing grounds. Labcorp will alert the Court when the Supreme Court issues its opinion,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

which is expected by term's end of June 30, 2021.

## II. STATEMENT OF FACTS

### *A. Plaintiffs' Statement of Facts*

#### 1. LabCorp's Business

LabCorp "provides diagnostic, drug development, and technology-enabled solutions for more than 160 million patient encounters per year, or more than 3 million patients per week." (Ex. 24, at JA0550 [LabCorp 2021 Form 10-K].) LabCorp has experienced a sharp improvement in its fortunes since the dawn of the global pandemic, reporting revenue growth of 23% from 2018 to 2020, and total revenue in excess of $11.5 billion in 2019. (*Id.*; see also, Ex. 18, at JA0456:19-457:1 [Wright deposition].)

LabCorp has approximately 1,853 patient service centers ("PSCs") throughout the country where customers can, among other services, make appointments, pay their bills, and obtain laboratory services such as blood work or urine tests. (Ex. 12, at JA0044:2-17, JA0045:2-19, JA0046:24-48:12 [Sinning deposition]; Ex. 17, at JA0419:1-24, JA0420:3-20 [DeAngelo deposition].) Many tests LabCorp administers require patients to fast, thereby rendering delay in providing testing services an issue of patient care. (Ex. 13, at JA0157:3-158:19 [Vargas deposition].)

#### 2. Project Horizon

Beginning in 2016, LabCorp implemented "Project Horizon," wherein the Company replaced its manual patient check-in system with LabCorp Express – an automated check-in system where LabCorp directs patients to check in at what is essentially a modified iPad. (Ex. 12, at JA0049:25-50:5, JA0059:7-23, JA0068:18-23 [Sinning deposition]; Ex. 26, at JA0710 [LabCorp's document production].) Project Horizon is branded as LabCorp Express to the public. (Exs. 22 and 23, at JA0533-541[LabCorp Express trademark applications].)

The purpose of Project Horizon was simple: through automation of the check-

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

in process, LabCorp hoped to increase its capacity (what it called "PPD" or "patients per day") while at the same time reducing its labor costs. (Ex. 17, at JA0435:10-20 [DeAngelo deposition]; Ex. 16, at JA0409:13-411:4 [Bohannon deposition]; Ex. 12, at JA0056:15-57:8 [Sinning deposition].) Ultimately, LabCorp implemented the inaccessible Express kiosks in nearly all its PSCs nationwide: 1,853 locations nationally and 280 locations within California. (Ex. 12, at JA0047:24-48:13, JA0066:12-22 [Sinning deposition].)

Internal LabCorp documents demonstrate that for an upfront capital expenditure of $22.4M, Horizon would pay for itself in less than four years. (Ex. 12, at JA0054:13-55:6, JA0078 [Sinning deposition].) Transitioning to the self-check-in kiosks also benefitted LabCorp to the tune of $14 million dollars in savings in 2019, realized from both the reduction in labor costs, and the ability to see more patients without hiring additional employees. (*Id.* at JA0055:7-16 [Sinning deposition]; *see also*, Ex. 17, at JA0422:3-12 [DeAngelo deposition].)

A third-party vendor, Aila, contracted with LabCorp to provide the iPads for the Express kiosks. (Ex. 18, at JA0464:11-20 [Wright deposition].) Before contracting with Aila, LabCorp considered Olea Kiosks, Inc. Olea manufactures an ADA and HIPAA-compliant kiosk. (Ex. 26, at JA0711-714[LabCorp's document production]; Ex. 18, at JA0477:1-14 [Wright deposition].) Olea included the accessible features in its proposal to LabCorp. (*Id.*) A typical iPad is equipped with Apple's built-in IOS accessibility features for the legally blind, including a built-in screen reader program called VoiceOver that many legally blind individuals use on a regular basis. (Ex. 13, at JA0149:23-150:4 [Vargas deposition].) An iPad also is equipped with a headphone port that allows a legally blind individual to utilize VoiceOver without public disclosure of what the screen reader is reading. (Ex. 28, at JA0850-51[Montgomery report].) Despite the built-in accessibility of iPads and the proposal from Olea offering the accessible kiosk, LabCorp decided instead to contract with Aila, resulting in a kiosk that does not have any accessibility features





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

which would allow a blind individual to use the kiosk independently. (Ex. 12, at JA0065:7-67:8 [Sinning deposition].)

Notably, at the inception of Project Horizon, LabCorp conducted an internal risk scenario wherein it determined that one of the barriers to implementation was that blind patients could not access the kiosks independently. (Ex. 12, at JA0051:25-52:2, JA0072 [Sinning deposition]; Ex. 17 at JA0423:5-12 [DeAngelo deposition].) Yet, despite being presently aware of this risk scenario and the availability of accessible kiosks, LabCorp's Senior Vice President for IT, Mark Wright, conceded the Company chose to select an inaccessible kiosk for the entire 1,853 PSC network. (Ex. 18, at JA0467:21-468:13, JA0458:7-459:3, JA0470:4-11, JA0471:25-476:9 [Wright deposition].) While the kiosk Wright selected had the capability of being made accessible, the specific design he selected rendered it inaccessible and failed to make use of IOS's many accessibility features. (*Id.*) Wright chose not to utilize the IOS accessibility features and instead chose to cover the headphone port. LabCorp implemented this design across the Company's 1,853-location network.[2] (Ex. 12, at JA0047:2-20 [Sinning deposition].) Despite being very aware the move to a kiosk check-in system would prevent blind customers from being able to independently access the kiosks (see Ex. 12, at JA0072, JA0133-135 [Sinning deposition]; Ex. 18, at JA0458:7-23 [Wright deposition]), the Company disregarded those concerns because there was no compelling "business case" for providing such an accommodation to blind patients, claiming, without any documentary support, that an accessible kiosk was "ten times" more expensive than the Aila kiosk. (Ex.

[2] At deposition, Wright self-servingly testified after the fact (and without a shred of documentary support) that the decision to choose an inaccessible kiosk was aimed at preventing vandalism. (Ex. 18, at JA0465:23-467:14.) Notably, LabCorp had no similar security concern with regard to the self-payment scanner placed at the kiosk as part of Project Horizon, the implementation of which allowed the company enjoy millions of dollars in cost savings from the payment of overdue invoices. (Ex. 18, at JA0462:21-463:7, JA0469:2-19.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

18, at JA0478:21-480:14 [Wright deposition].) Yet, at the same time, Wright conceded that each time LabCorp needed to refresh or replace the kiosks, he never once analyzed whether the Company could provide a cost-comparable accessible kiosk for blind customers. (*Id.*, at JA0487:16-488:25 [Wright deposition].)

Internal LabCorp documents from 2016-2017 make clear the Company recognized that effective patient adoption of the kiosks as a means of self-check-in was critical to achieving the cost savings projected by the company. LabCorp actively encouraged its employees to "redirect" patients who failed to check-in at the kiosks back to the device to do so. (Ex. 17, at JA0424:25-425:4, JA0445 [DeAngelo deposition].) LabCorp further failed to provide its executive or front-line employees any training on how to engage in the interactive process or interact with blind individuals. (Ex. 17, at JA0421:12-18 [DeAngelo deposition]; Ex. 12, at JA0071:8-17 [Sinning deposition].) LabCorp's messaging left both high-level employees working on Project Horizon's implementation and on-site personnel at LabCorp PSCs with the distinct impression that use of the kiosks was mandatory. (Ex. 12, at JA0061:23-64:14, JA0133 (use of kiosk "not optional") [Sinning deposition]; Ex. 20, at JA0518:5-523:17, JA0524:8-15 [Coan deposition].)

Senior executives knew employees were operating under this perception and knew the kiosks were not independently accessible to blind patients. (*Id.*, see also, Ex. 17, at JA0428:7-10, JA0429:18-22, JA0430:14-21 [DeAngelo deposition]; Ex. 19, at JA0508:5-14 [Porter deposition]; Ex. 18, at JA0458:7-23 [Wright deposition].) Yet these same executives failed to take any action prior to this lawsuit to correct this purportedly incorrect perception through company-wide email or any other means. (*Id.; see also,* Ex. 17, at JA0431:5-434:17 [DeAngelo deposition].) LabCorp's actions, or lack thereof, resulted in the company directing numerous blind patients to a kiosk the company knew was inaccessible. (*See, e.g.*, Ex. 14, at JA0254:14-24, JA0257:8-20, JA0272:6-13 [Davis deposition].) And while LabCorp closely monitored the reduction in sighted patient wait times, it never assessed

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

whether blind patients similarly benefitted from a reduction in wait time, despite being on notice the kiosk is not independently accessible. (Ex. 18, at JA0485:1-486:22 [Wright deposition].)

Almost immediately after rolling out the kiosks and at least as early as June of 2018, LabCorp began receiving complaints from blind patients that "[t]he new check in kiosk is NOT accessible for blind/low vision individuals." (Ex. 26, at JA0719, Column H, Row 167 [LabCorp survey responses].)[3] LabCorp's patients told the Company that LabCorp employees were directing blind patients to use the Kiosk: "[t]he woman behind the counter in a monotone voice said to use the kiosk to sign in when standing there." (*Id.*) The complainant requested LabCorp provide its staff with "training on individuals with disabilities." (*Id.*) Despite such requests, LabCorp provided no training and made no effort prior to this litigation to inform its employees that blind patients should not be directed to the Kiosks because they are inaccessible. (Ex. 17, at JA0428:7-10, JA0429:18-22, JA0430:14-21, JA0431:5-434:17 [DeAngelo deposition]; Ex. 19, at JA0508:5-14 [Porter deposition]; Ex. 18, at JA0458:7-23 [Wright deposition].)

LabCorp's failing caused its staff to direct class representative Luke Davis to use an inaccessible Kiosk to check-in on seven different patient visits across three separate locations. (Ex. 14, at JA0254:14-24, JA0257:8-20, JA0272:6-13 [Davis deposition].) LabCorp also received at least ***190 complaints*** of visually impaired or

---

[3] Curiously, LabCorp's executives explained at deposition that the company did both consider and take action in regard to the needs of mobility-disabled patients, by designing the Express kiosk with a stand that met the ADA's height regulations. (Ex. 18, at JA0458:7-459:3.) Similarly, in the developmental stages of Project Horizon, the Company's executives both identified and implemented a fix that would ensure that the Express kiosks were outfitted with a Spanish speaking translation function. (Ex. 18, at JA0481:3-482:9.) Despite knowledge of the kiosks' inaccessibility, however, LabCorp took no similar action to address the needs of its blind customers.



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

legally blind individuals across each of LabCorp's six nationwide divisions (Northeast, MidAmerica, North Central, Atlantic, Southeast, West), who could not access the kiosks independently, indicating the problem is system wide. (Ex. 26, at JA0719-720 [LabCorp survey responses and blind user complaints].)

Nevertheless, Mr. Wright conceded he and his team did not speak to a single blind person or blind disability rights group (like ACB) about whether better, cost-effective kiosk options for the blind might exist or how to utilize the existing iPad accessibility options. (Ex. 18, at JA0483:18-484:7 [Wright deposition].) Nor could he provide any explanation for how other electronic kiosks, such as ATM machines, are routinely outfitted with accessible features for blind customers such as headphone ports and tactile keypads – and still manage to maintain ample security features. (*Id.*, at JA0470:25-472:22 [Wright deposition].)

Notably, as the Declaration of kiosk expert Rachael Montgomery makes clear, cost-effective, accessible kiosk options ***did*** and ***do*** exist, and are readily achievable. (Ex. 28, at JA0850-853[Montgomery report].)

In addition to LabCorp Express, the Company offers its sighted patients the option of booking appointments online through a dedicated website (i.e., LabCorp Pre-Check). (Ex. 17, at JA0418:20-25, JA0419:18-24 [DeAngelo deposition].) Such appointments can then be managed through use of the LabCorp mobile app, which in turn allows those customers to "check in" at the PSC by scanning a QR code. (Ex. 12, at JA0060:6-24 [Sinning deposition].) However, the record demonstrates that neither the website nor the mobile app (nor the kiosk) is independently accessible for blind customers. (Ex. 14, at JA0275:6-17 [Davis deposition]; Ex. 28, at JA0850-853 [Montgomery report].)

Rather, the evidence demonstrates that at the same time the Company moved to an integrated check-in system with the kiosk, website, and mobile app, it reduced its staffing levels across the PSCs. (Ex. 20, at JA0517:9-13 [Coan deposition]; Ex. 19, at JA0510:9-511:9 [Porter deposition]; Ex. 17, at JA0436:14-440:7, JA0441:1-

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

10 [DeAngelo deposition].) In fact, LabCorp classifies more than 440 PSCs as "FRE 1" – meaning the equivalent of *one* employee works there. (Ex. 18, at JA0460:11-461:12 [Wright deposition]; Ex. 17, at JA0442:19-443:18 [DeAngelo deposition].) That employee is almost always a phlebotomist whose primary function is to draw blood and who rarely has the bandwidth to attend to the waiting area – based on the documented experiences of numerous blind patients, more than 190 blind and visually impaired customer complaints and internal LabCorp documents. (*Id.*; *see also*, Ex. 26, at JA0719-720 [LabCorp survey responses and blind user complaints].)

Yet, despite this uncontroverted evidence, LabCorp now maintains its blind customers can check-in timely at a front window, bypassing the kiosk experience altogether. (Ex. 12, at JA0053:16-22 [Sinning deposition].)

The reality of Defendant's "separate but unequal" system is far different. As corroborated by the experiences of plaintiffs Vargas, Davis, and several members of ACB – blind LabCorp customers are routinely confronted with the Hobson's choice of either (1) waiting for a LabCorp employee to notice them to assist them with the kiosk check in or (2) to seek assistance with the check in from random strangers in PSC waiting rooms, revealing their confidential personal information in the process. In contrast, sighted customers can proceed directly to the kiosk and check in, putting them ahead of line in the queue. (Ex. 12, at JA0069:18-70:18 [Sinning deposition].) The result is that blind customers experience longer wait times than their sighted counterparts, simply because LabCorp decided offering an accessible kiosk was not a priority. (*Id.*) This is precisely the type of casual "separate but unequal" treatment the accessibility laws were enacted to prevent.

### 3. Plaintiffs Cannot Independently Use The Kiosks

#### a. Luke Davis

Luke Davis is legally blind and relies on screen-reading software to read electronic written material. (Ex. 14, at JA0228:18-23, JA0230:1-10, JA0252:5-8 [Davis deposition].) He lives in Philadelphia, Pennsylvania. (*Id.*, at JA0219:4-8.) He

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

owns his own consulting service offering computer network support work, including supporting individuals who are blind with accessibility to Windows and iPhone usage. (*Id.*, at JA0227:1-23.) Mr. Davis is also a musician, an audio technician, and a computer programmer. (*Id.*)

Mr. Davis has visited several of his local LabCorp locations for periodic blood and urine tests approximately one to three times per year, both before and after LabCorp introduced the kiosk, as it is in his health insurance network. (*Id.*, at JA0232:21-233:23, JA0235:4-18, JA0237:12-21.) LabCorp required Mr. Davis to check in every time he visited a PSC. (*Id.*, at JA0235:12-18.) He has visited multiple PSCs in Philadelphia. (*Id.*, at JA0236:1-23.)

Mr. Davis first learned LabCorp implemented the kiosk check-in process when he presented at the Bustleton Avenue PSC for routine lab work on or around October 11, 2016. (*Id.*, at JA0266:22-267:12.) On that occasion, he went to the check-in window, as he had in the past, but the staff at the window told him he was required to use the kiosk to check-in. (*Id.*, at JA0254:14-24.) Mr. Davis informed the staff he was blind and asked if he would be able to use the kiosk. (*Id.*, at JA0256:10-21.) The LabCorp staff told him they did not know if the kiosk was accessible and that the person who had accompanied Mr. Davis to LabCorp should help him check in. (*Id.*) The LabCorp representative did not offer to help Mr. Davis check in and instead told Mr. Davis he was required to use the kiosk. (*Id.*, at JA0256:24-257:3.)

Thereafter, LabCorp staff told Mr. Davis on at least six occasions that he was required to use the kiosk to check in. (*Id.*, at JA0272:6-13, JA0257:8-20.) Mr. Davis recalled one occasion, in December 2017, when he tried to make an appointment online but could not because of inaccessibility issues with the website. When he arrived at LabCorp, the staff again told him to use the kiosk to check in. Fortunately, his mother was with him. However, as they went through the kiosk questions, he had to speak his private information to his mother so she could complete the check in, including name, address, telephone number, and date of birth, that he would have

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

preferred not to speak out loud in a public waiting room for privacy concerns. (*Id.*, at JA0274:21-276:4.) On another occasion, Mr. Davis had to ask for help from another patient's aid worker. (*Id.*, at JA0296:5-9.) On yet another occasion, Mr. Davis had to have a relative, whom he believes to be a criminal and does not trust, take his personal information to enter into the kiosk. (*Id.*, at JA0299:14-22.) LabCorp has never allowed Mr. Davis to check-in at the window since implementing the kiosks, instead requiring Mr. Davis to check in at the inaccessible kiosks on at least six occasions. (*Id.*, at JA0264:1-9.)

On October 29, 2019, Mr. Davis tried to make a written complaint to LabCorp about the inaccessible kiosk. In a sad irony, however, the feedback system on LabCorp's website was inaccessible, so he was unable to submit the form to LabCorp. (*Id.*, at JA0293:3-14.) He had previously verbally complained to staff at the LabCorp windows about the inaccessibility of the kiosk; yet they still required him to check in at the kiosk. (*Id.*, at JA0294:5-23, JA0295:19-296:9.)

After LabCorp staff repeatedly told him he was required to check in at the inaccessible kiosk, Mr. Davis began trying to utilize the mobile check-in option in October 2019. (*Id.*, at JA0272:14-24.) While the mobile check-in option allowed Mr. Davis to check-in, it did not give him access to any of the other features the kiosk has, including billing and other services. (*Id.*, at JA0272:23-273:10.) Mr. Davis, like other blind individuals, experienced significant anxiety when confronted with the choice of whether to complain to someone he depends on for his healthcare – LabCorp – or simply live with the discriminatory experience every time he enters a PSC.

After Mr. Davis' numerous experiences with LabCorp's inaccessible kiosks, he realized this issue was not just affecting him, but also thousands of blind individuals throughout the country. Because his multiple complaints went unanswered, he decided litigation seeking injunctive relief would be the only way to achieve the result of an accessible experience for LabCorp's blind patients. (*Id.*, at

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JA0336:7-22, JA0337:21-338:3.) Mr. Davis then contacted Nye, Stirling, Hale & Miller to ask whether they would be willing to pursue this case, based on the firm's experience with class actions and accessibility actions. (*Id.*, at JA0336:23-337:19.) Since that time, Mr. Davis has been actively involved in the litigation – frequent communications with counsel, providing documents in discovery, involved in settlement and mediation discussions, and preparing and sitting for deposition, and supervision of counsel. (*Id.*, at JA0338:8-339:5.) He is aware of the legal theories, the court, and the judge, and does not have a primary financial motivation – he simply wants LabCorp to make the kiosks accessible. (*Id.*, at JA0340:4-23.)

**b. Julian Vargas**

Julian Vargas lives in Van Nuys, California. (Ex. 13, at JA0141:24-25 [Vargas deposition].) He is legally blind and uses screen reader as an auxiliary aid that allows him to understand the information displayed on a screen. (*Id.*, at JA0150:12-151:20; 182:17-21.) Mr. Vargas works as a consultant providing end-user support to individuals looking to become more proficient and understanding of how to use assistive technology, primarily on the iOS operating system. (*Id.*, at JA0148:9-149:22.)

Mr. Vargas had to visit a LabCorp facility in Van Nuys on Friday, January 10, 2020, for lab work. Because he knew the blood work required him to be fasting, Mr. Vargas took a bus to the facility a day or two before to familiarize himself with the facility. (*Id.*, at JA0157:3-158:19; JA0159:16-18.) At his pre-appointment visit, Mr. Vargas went to the window, waited for staff, and explained he was legally blind, had a fasting appointment on January 10, and asked whether he would have to check in at the kiosk. The LabCorp staff told Mr. Vargas the kiosk was not accessible for a blind person to access independently, so he would be required to have an attendant to check him in. (*Ibid.*) The staff assured Mr. Vargas someone from LabCorp would be there to check him in. (*Ibid.*) On the day of his January 10, 2020, appointment, Mr. Vargas took a paratransit service to the LabCorp facility. (*Id.*, at JA0159:13-15.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

When he arrived at LabCorp, Mr. Vargas waited in line, and when he got to the window, asked for assistance. He waited about three to five more minutes while the original employee found someone else who could assist him with checking in since the kiosk was not accessible. (*Ibid.*; *see also,* Ex. 13, at JA0160:21-161:2; JA0165:2-16.) When the second employee came to the window, Mr. Vargas expressed that he did not want to provide his personal information within earshot of others and asked if he could instead provide the employee his identification and insurance cards, which he did. (*Id.*, at JA0163:7-22.)

Mr. Vargas is serving as a class representative in this case because he wants to help remove access barriers to allow himself and other blind people to live as independently as possible. (*Id.*, at JA0203:21-204:7.) He does not have financial motivation – he simply wants blind people to be able to avail themselves to the services available to others, like the kiosks. (*Id.*, at JA0204:8-15.) Mr. Vargas has been involved in this litigation by speaking with counsel frequently, helping respond to discovery, and preparing for and sitting for deposition. (*Id.*, at JA0196:11-15; JA0204:16-205:12.) He understands the laws at issue in the case, the court where the case is venued, and the judge in charge of the case. (*Id.*, at JA0205:14-206:15.)

**c. ACB Members**

ACB is a national membership organization of thousands of blind and visually impaired persons. (Ex. 11, at JA0034:15-25 [Stanley deposition].) ACB has members in all 50 states and the District of Columbia, and seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people. (Dkt. 40, ¶ 16 [FAC].)

Since at least December 2018, members of ACB have informed ACB that LabCorp's kiosks are inaccessible to them. (*See, e.g.*, Ex. 25, at JA0711 [ACB member complaint].) ACB members across the country, ranging from California, New Jersey, Missouri, North Carolina, Colorado, Florida, Texas, and the District of Columbia, have reported similar experiences of visiting LabCorp and being unable

to sign in independently, requiring the assistance of someone other than a staff member to check them in for their appointments. (*See, e.g.*, Exs. 5-10, at JA0024-29 [ACB member declarations]; Ex. 25, at JA0703, 705-709 [Plaintiffs' document production].) For instance, ACB member Robin Van Lant went to a LabCorp in late 2019. (Ex. 15, at JA0400:1-11 [Van Lant deposition].) When she arrived, she brought her paperwork to the desk and waited for a long time, with nobody at the desk to help her. (*Ibid.*) Her husband eventually came to pick her up, and she told him she had not checked in yet. He told her there was a kiosk she was supposed to check in at. (*Ibid.*) Her husband then had to check in for her, as she could not independently use the kiosk. (*Id.*, at JA0401:12-15.) Ms. Van Lant testified that her inability to independently use the kiosk, and the corresponding wait time at the desk for an attendant who never came, caused her to wait longer to check in than sighted individuals, and that had her husband not come to check on her, it would have been much longer. (*Id.*, at JA0402:4-6.)

Ms. Van Lant's experience is echoed in the declarations of numerous ACB members. ***Not one ACB member was able to independently use the kiosk, and instead had to wait for either an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk.*** (*See, e.g.*, Exs. 5-10, at JA0024-29 [ACB member declarations].) While one ACB member testified he was able to promptly check in at the window and avoid using the kiosk, he also testified that the kiosk is not accessible. (Ex. 21, at JA0531:24-532:14 [Harden deposition].) Thus, Mr. Harden's experience of having a staff member at the window does nothing to change the pertinent analysis of this case – does LabCorp offer a good or service (its LabCorp Express kiosk) that is inaccessible to the class of legally blind individuals, and therefore discriminatory against the class.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

### *B. Defendant's Statement of Facts*

#### 1. <u>Labcorp PSCs And The PSC Check-In Process</u>

There are approximately 2,000 Labcorp PSCs throughout the country, and 299 PSCs in California. (Ex. 32, at JA1062, Sinning Dep. at 35:2-15.) Tens of millions of patients visit Labcorp PSCs annually. (Exs. 41, 42, 44, at JA1131, JA1132, JA1134 Davis-Labcorp Bates Nos. 4749, 4750, and 4752 (61,522,195 PSC visits between January 1, 2018 and December 30, 2020).) In October 2017, Labcorp began introducing check-in kiosks at PSC locations, and simultaneously updated the front desk check-in capabilities and hardware to make front desk check-in more efficient. (Ex. 32, at JA1071, Sinning Dep. at 83:3-11; Ex. 33, at JA1083-84, Wright Dep. at 39:18-40:3, 40:19-25.) The roll out to get kiosks placed in over 90% of PSCs took almost a year, with (for example) only 4% of PSCs with kiosks in December 2017, then 35% with kiosks in April 2018, and up to 92% in August 2018. (Ex. 48, at JA1190, Deal Rpt., Ex. 3: Chart.) The kiosk roll-out that started in October 2017 is still ongoing and not all PSC locations are equipped with self check-in kiosks; for example, in late February 2021, 19 of the 299 California PSCs did not yet have a kiosk. (Ex. 32, at JA1064, Sinning Dep. at 40:3-7.)

Labcorp was aware that a check-in process at PSC kiosks (which are touch screen tablets with attached scanners) was not a check-in option for the blind—thus, Labcorp ensured that front desk check in would remain available at all PSCs to assist persons who could not use, or did not want to use, the self check-in option. (Ex. 33, at JA1083-84, Wright Dep. at 39:18-40:3 ("We found it not at all physically practical within our design constraints to service blind people, **and we designed the solutions so that blind people could be serviced at the desk, because we also built the solution to operate behind the desk in the same efficient way that it operated on the tablet**. So we had to make design decisions to make [the kiosk] accessible to wheelchair-bound people and low vision people, but we explicitly recognized that the device could not service a blind person, and they would have to be serviced by the





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Express solution behind the desk.") (emphasis added).)

The kiosks are only available for use during normal business hours, when there is also at least one employee present at each PSC who can operate front desk check ins as needed. (Ex. 32, at JA1065-66, Sinning Dep. at 43:6-44:2.) Staffing varies widely depending on location and a PSC's size: some locations have a dedicated patient intake representative ("PIR") who sits full time at the front desk to check in patients; others have phlebotomists to conduct both check in and testing; and some PSCs are located inside Walgreens stores where there is always a dedicated Walgreens staff member to assist patients. (*Id*., at JA1067-70, *id*. at 47:22-48:4, 78:3-8; 79:12-21.)

For PSC sites with an operating kiosk, customers can check-in at the front desk or using the on-site kiosk available during business hours. (*Id*., at JA1065-66, *id*. at 43:6-44:2.) Using a kiosk to check in at a PSC is not mandatory, and it would violate Labcorp's policy to tell customers otherwise. (*Id*., at JA1065-66, JA1075-76, *id*. at 43:6-44:2, 113:8-19, 117:8-20.) Further, a substantial segment of PSC patients continue to use the front desk to check-in for appointments; in a recent six-month span between April 2020 and February 2021, more than one third of PSC customers have opted not to use a kiosk to check in for appointments, with approximately 25.4% checking in at the front desk. (Ex. 48, at JA1191, Deal Rpt., Ex. 4, PSC Check-in Metrics.) *Id.*[4] Whenever a kiosk at a given location is not operational (which can happen for a variety of reasons), all on-site check-ins take place at the front desk. (*See* Ex. 40, 43, 45, at JA1130, JA1133, JA1135, Davis-Labcorp 4748, 4751, and 4755.)

The kiosks do not provide customers test results and are not used for ordering testing services. (Ex. 32, at JA1072-73, JA1077-81, Sinning Dep. at 94:9-18, 97:14-

---

[4] While LabCorp knows how many patients checked in, and has information on those patients from their provided ID and insurance, LabCorp does not have information on which persons would fall into the category of legally blind, so as to identify putative class members.



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

16, 167:22-168:14, 169:9-16, 170:6-25, 171:1-19.) All tasks that can be performed at the kiosk (check-in and payment of past invoices) can also be performed at the front desk with PSC staff who use a similar tablet device and software (Express Admin) as that housed in the kiosk for self check-in. (*Id*., at JA1065-66, JA1074, *id.* at 43:14-44:2, 111:9-20.) PSC employees have been instructed and reminded that self check-in is not for every patient. (Ex. 17, at JA0445, May 2018 newsletter to PSC staff (explaining that front desk check-in is provided for persons who did not, cannot, or will not use kiosk); Ex. 34, at JA1086-87, DeAngelo Dep. at 101:13-102:6.)

The service offered at Labcorp's PSCs is the collection of samples (e.g., blood and urine) for testing, which samples are collected by on-site phlebotomists. (Ex. 32, at JA1063, 1067-68, *id*. at 36:2-19, 47:25-48:4.) Neither Plaintiff Davis nor Vargas, nor any of ACB's declarants, claim that they were denied access to the testing services offered at any PSC, and (as further detailed below) each was able to check in for, and receive, testing services.

**2. <u>Plaintiffs' Testimony Regarding Visits To Labcorp PSCs</u>**

**Plaintiff Vargas**. On or around January 9, 2020, Plaintiff Vargas visited Labcorp's PSC at 15211 VanOwen Street, Van Nuys, California, to familiarize himself with the check-in procedures at the facility. (Ex. 13, at JA0157, 0159, Vargas Dep. at 21:3-25, 23:2-4.) During this visit, he went to the front desk, asked about using the kiosk for his next-day visit, and was told by Labcorp's staff that he would be able to be checked in by a staff member at the front desk. (*Id.*, at JA0158, JA0170-72, *id.* at 22:1-13, 34:4-35:6, 35:21-36:5 (he was told, "[a]ll I needed to do was come to the window or the desk at the date of the appointment, you know, the day that I needed the service, and that they would make someone available to help me with the check-in process.").) The next day, Plaintiff Vargas returned for a blood test and went to the front desk to be checked in for service. (*Id.*, at JA0158, *id.* at 22:14-19.) He waited in a short line at the counter (*Id.*, at JA0161, JA0165, *id.* at 25:3-17, 29:6-9), explained he would need assistance with check-in, and then someone came to ask for

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

his ID and insurance card and checked him in. (*Id.*, at JA0162-63, *id.* at 26:18-27:22). He was then taken to a private room for the test a few minutes later. (*Id.*, at JA0165, *id.* at 29:2-16.) Mr. Vargas received the blood testing services that he sought from Labcorp, and was never told he needed to check in at the kiosk:

> Q: And is it fair to say that on the date you visited the Labcorp facility with your prescription, they provided you with medical diagnostic testing services?
>
> A. Yes.
>
> Q. And no one at Labcorp ever refused to provide you with those services; is that correct?
>
> A. Correct.
>
> Q. And no one at Labcorp told you that checking in at the kiosk was the only option for checking in; is that correct?
>
> A. No, I just understand it to be one of two options available.
>
> Q. And the other option is to check in with a person at the desk, correct?
>
> A. Yes.
>
> Q. And so you were never told that the only option for checking in at Labcorp was to check in at the kiosk, correct?
>
> A. Correct.

(*Id.*, at JA0173-74, *id.* at 37:13-38:6.)

**Plaintiff Davis**. Plaintiff Davis visited Labcorp PSCs in Philadelphia for a few years before the introduction of the kiosks, checking in at the front desk. (Ex. 14, at JA0233-34, JA0239, Davis Dep. at 20:24-21:7, 26:5-22.) He claims to have visited Labcorp's PSCs in Philadelphia, Pennsylvania on multiple occasions—including on October 11, 2016, December 23, 2017, and March 28, 2018—for routine medical diagnostic tests. (*Id.*, at JA0266, *id.* at 53:10-16]). Davis claims he attempted to check-in at the desk on each occasion but was told by the PSC employee that he needed to use the kiosk for check-in (*id.*, at JA0267, *id.* at 54:8-12), and that these directives started with his 2016 visit. (*Id.*, at JA0269, *id.* at 56:9-16.) As of October 11, 2016, however, no Labcorp PSC, let alone the PSCs in Pennsylvania that Davis claims to have visited, had yet to introduce a touchscreen kiosk for check-in. (Ex. 32,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

at JA1071, Sinning Dep. at 83:3-11.) As such, there was not even the option for Plaintiff Davis or any other Labcorp customer to check in via kiosk.

On each occasion that Plaintiff Davis visited a Labcorp PSC, he was able to receive the medical diagnostic testing services his doctor ordered. (Ex. 14, at JA0290, Davis Dep. at 77:18-22.) Davis does not claim to have visited a PSC in California at any time.

**Plaintiff ACB**. Plaintiff ACB is an affinity group of approximately 20,000 persons, but has no information on how many of those members would fall into the category of "legally blind." (Ex. 35, at JA1090-91, Stanley Dep. at 20:9-21:8.) Just prior to joining this lawsuit, ACB sent a survey to 4,542 members and asked them about their kiosk check-in experiences at Labcorp's PSCs. (Ex. 47, at JA1038, ACB's Supplemental Response to Labcorp's RFP No. 17.) Only 12 of its members responded to the survey with any information about their kiosk experiences; importantly, ACB is not aware of any of its members other than those 12 as having visited a Labcorp PSC. (Ex. 35, at JA1093-94, Stanley Dep. at 26:24-27:9.)

One ACB member, John Harden, responded and informed ACB that whenever he visited Labcorp's PSC at 927 Beville Road in South Daytona, Florida, a PSC employee checked him in at the front desk for service. (Ex. 46, at JA1136, Bates PL206.) In his survey response, Mr. Harden stated that he did not know there was an e-kiosk and always checked in with the front desk, commenting: "ADA states that a business needs to make reasonable accommodations for the disabled; they certainly do that." (Ex. 36, at JA1107, Harden Dep. at 23:3-17.) Mr. Harden further testified at his deposition that he is "totally blind," visits a PSC every three months, and has never been denied goods or services from Labcorp at a PSC. (*Id.*, at JA1103, JA1105-06, *id.* at 16:12-20, 21:20-22:11.) He also added that his wife, who is also legally blind, visits every three months, has also never been asked to use the kiosk, and also checks in with the front desk. (*Id.*, at JA1108-09, at 25:5-26:19.) Another ACB member who responded to the survey and was later deposed, Robin Van Lant, testified

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

that no PSC employee directed her to use a kiosk (Ex. 37, at JA1113, Van Lant Dep. at 35:11-16), but that instead on one visit in 2019, her husband noticed it and used it to check her in. (*Id.*, at JA1114, *id.* at 41:11-16 ("If my husband had not been there, I would not even have known of the kiosk and would have just waited for a receptionist to talk with.").)

Plaintiff ACB's 30(b)(6) representative testified that one of its preferred check-in experiences is having a staff member available to check-in blind or visually impaired individuals. (Ex. 35, at JA1101, Stanley Dep. at 78:6-9.) ACB's representative indeed confirmed that allowing check-ins with a PSC employee is not a discriminatory practice. (*Id.*, at JA1097, *id.* at 57:19-23.) Moreover, ACB's representative agreed that "[n]o two people with a visual impairment need the same accommodation" (*id.*, at JA1092, *id.* at 22:21-22) and that no remedy would be needed for visually disabled persons who have been able to check in at the PSC front desk. (*Id.*, at JA1101, *id.* at 78:17-24.) Plaintiff ACB also agreed that a technical upgrade to the kiosk to include something such as speech output would not resolve the accessibility concerns of everyone that is blind or visually impaired, because different persons have different comfort levels with various technologies. (*Id.*, at JA1099-1100 , *id.* at 72:20-73:4.)

Six ACB members provided short cookie cutter declarations in support of the class certification motion (*see* Exs. 5-10 at JA0024-29); no member claims in his or her declaration to have been denied testing services at a PSC. (*Id.*) Only one ACB declarant is a California resident—John Nuanes—and Mr. Nuanes attested that his wife checked him in via the kiosk, which he presumes he could have used independently if it had screenreader and VoiceOver compatibility. (Ex. 6, at JA0025, Nuanes Decl.) Mr. Nuanes did not claim that no person was at the front desk to check him in immediately when he arrived, or that he had to wait to check in. (*Id.*)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

### 3. Plaintiffs' Experts[5]

**Rachael Bradley Montgomery**. Ms. Montgomery provided her opinion that the Labcorp check-in kiosks are not independently accessible to blind users because the kiosks do not provide for audio alternatives to access visual content. (Ex. 28, at JA0850-53, Montgomery Report.) Ms. Montgomery opined that adding technologies such as VoiceOver application and AudioNav keyboards, would help with "increasing the accessibility for blind users." (*See* Ex. 28, at JA0851, Montgomery Expert Report[6]. However, in her deposition, she admitted that the technologies she proposes would not make the kiosks fully and independently accessible for all legally blind persons. (Ex. 38, at JA1116-17, Montgomery Dep. at 106:3-17; 109:12-21.) Ms. Montgomery has no information as to the actual preferences of legally blind persons as to checking in at PSCs (Ex. 38, at JA1117, *id.* at 109:4-14), and concedes that she has no information that checking in via kiosk would be faster than checking in with the front desk, given that individual situations vary. (Ex. 38, at JA1118, *id.* at 144:6-10.)

**Sean Chasworth**. Mr. Chasworth provided his opinion that approximately 87,500 legally blind persons per year nationally, and 8,861 legally blind persons per year in California, were denied independent access to PSC check-in counters each year. (Ex. 27, at JA0721-27, Chasworth Report.)[7] He then used the 8,861 minimum

---

[5] On March 29, Plaintiff provided LabCorp with two expert reports; depositions of those experts took place on April 15 and April 16, after Plaintiffs had provided their portion of this Joint Motion. Thus, only rough transcripts are available, and have been provided in the Joint Appendix.

[6] Ms. Montgomery also voiced opinions regarding LabCorp's website and application, which are not relevant to Plaintiffs' proposed classes comprised of persons visiting PSCs and purportedly denied access to a check-in kiosk.

[7] Mr. Chasworth's numbers fluctuated wildly throughout his report, with his number of potential California class members ranging from 1,575 individuals to 112,140



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

number of presumed legally blind California PSC users to make a "conservative" estimate that there would be at least a $35,440,000 per year statutory penalty (at $4,000 per customer) for each year of the class period under the Unruh Civil Rights Act, and $8,861,000 (at $1,000 per customer) per year under the California Disabled Persons Act. (*Id.*, at JA0727.) Mr. Chasworth also opined that there could be as many as 112,400 California legally blind residents in any particular year who would be entitled to such statutory damages. (*Id.*) However, in his deposition, Mr. Chasworth admitted the following:

- He has no method to offer to actually identify legally blind persons nationally or in California, let alone legally blind persons who may have visited a PSC when that PSC had a check-in kiosk (*see* Ex. 39, at JA1122-24, Chasworth Dep. at 53:19-55:19).
- He has no understanding of how the National Institute of Health estimated the percentage of legally blind persons and did no investigation of NIH's methodologies or data (*id.*, at JA1125, *id.* at 87:7-15).
- He was not provided with information on the rollout of the PSC kiosks nationally or in California, and was not aware that kiosks were not in all PSCs at all times during the class period (*id.*, at JA1120-21, *id.* at 40:3-12, 40:25-41:9).
- He presumes a minimum number of visits to a PSC by legally blind persons (even though he has no information about the nature of those visits, and whether a legally blind person was assisted at check-in by a PSC employee acting as a qualified reader for the check-in process) (*id.*, at JA1126-27, JA1128-29 *id.* at 131:3-132:5; 185:20-186:19).

---

individuals, more than 70 times higher. (Ex. 49, JA1194, Deal Rebuttal Rept. at 1, ¶ 4.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4. **<u>Defendant's Rebuttal Expert</u>**.[8]

Bruce Deal, managing principal of Analysis Group, Inc., provided a rebuttal report to Mr. Chasworth's analysis of likely class members. (Ex. 49, at JA1194-1204, Deal Rebuttal Rpt.) After analyzing Mr. Chasworth's methodologies, Deal found that Plaintiffs' expert overstated likely class members with flawed statistical modeling and assumptions. (*Id.*, at JA1194-95.) For example, Deal found:

- Even though Labcorp is far from the only option for medical testing, for half his estimates Mr. Chasworth (without support) assumes that every single blind person living in the same geographic area where at least one Labcorp PSC is located, visited a Labcorp PSC every year. (*Id.*, at JA1195, ¶ 5.)
- For the other half of his estimates, Mr. Chasworth attempts to adjust for Labcorp's market share be erroneously assuming that all of Labcorp's revenue is derived from testing at PSCs, when the evidence is that PSCs account for only 20% of Labcorp revenue. (*Id.*)
- All of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC would necessarily visit a PSC with a functioning kiosk; however, kiosks were rolled out at PSCs over time; some PSCs do not have kiosks; and that there were periods of time where certain kiosks were not operational. (*Id.*)
- In contradiction to evidence that different individuals had different experiences, all of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC necessarily would have attempted to use the check-in kiosk, been unable to do so, and been

[8] Mr. Deal's original Expert Report was provided to Plaintiffs on March 8, 2021; they have not yet sought to depose Mr. Deal. His rebuttal report is due by April 29, 2021 under the Court's order, but is being provided early to Plaintiffs along with this filing.

harmed as a result. (*Id.*)

As to the California sub-class particularly, Deal found that Chasworth's wide range of potential class membership stemmed from the unexplained application of different methodologies (*id.*, at JA1195-97, ¶¶ 7-13), the reliance on faulty assumptions (*id.*, at JA1198-1200, ¶¶ 15-21), a failure to account for variation in kiosk availability (*id.*, at JA1200-1201 , ¶¶ 22-25), and a failure to consider patients' individualized check-in experiences (*id.*, at JA1202-03, ¶¶ 26-29).

## III. ARGUMENT

### *A. Plaintiffs' Summary of the Argument*

This case is uniquely suitable for class certification pursuant to Rules 23(a), 23(b)(2), and 23(b)(3). The evidence demonstrates, for example:

- LabCorp's own witnesses admit its kiosks are not accessible to legally blind individuals;
- LabCorp has implemented the inaccessible check-in kiosks system across its entire national network of 1,853 PSCs;
- LabCorp trained its employees that use of the kiosks to check-in was mandatory;
- LabCorp admitted that use of the kiosk is a good or service it offers its customers;
- LabCorp does not offer a qualified aid or auxiliary service to allow legally blind individuals to access the check-in kiosk service;
- LabCorp has received at least 190 complaints from visually impaired individuals who could not independently access the kiosks; and
- LabCorp has still not remedied the inaccessible check-in kiosk that exists system wide.

As a result of these systemic violations, a class of legally blind individuals who rely upon LabCorp's goods and services will continue to be denied their civil rights absent class-wide relief.



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

In addition, the factual and legal issues in this action include an abundance of common class-wide issues that would have to be litigated repeatedly in separate individual actions absent class certification, including (1) whether LabCorp's check-in kiosks are a "place of public accommodation" under the ADA; and (2) whether LabCorp has satisfied its obligations under the relevant statutes to provide access to these services, including, but not limited to, by providing appropriate aids and auxiliary services to allow equal access to the blind community.

The named Plaintiffs' claims based on their own experiences at LabCorp are representative and typical of the class and all other requirements for certification of a Rule 23(b)(2) nationwide injunctive class and Rule 23(b)(3) California minimum statutory damages class are satisfied. Accordingly, certification of both the Nationwide and California class is appropriate.

Plaintiffs now move pursuant to Federal Rule of Civil Procedure, Rules 23(a) and 23(b)(2) to certify both a nationwide class of legally blind individuals and a California class of legally blind individuals against LabCorp on behalf of the following classes:

**Nationwide Injunctive Class:** All legally blind individuals in the United States who visited a LabCorp patient service center in the United States and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

**California Minimum Statutory Damages Class:** All legally blind individuals in California who visited a LabCorp patient service center in California and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

### *B. Defendant's Summary of the Argument*

Labcorp reasonably accommodates visually impaired patients by having an

employee check them in for their lab testing appointments. All Plaintiffs have received the lab testing ordered by their doctors, and none has been denied Labcorp's services, and thus summary judgment should be entered for Labcorp and no class should be certified. And regardless, this action cannot be certified as a class even if Plaintiffs' individual claims continue. As explained below, Plaintiffs have failed to meet their burden to show that certification is proper for either a 23(b)(2) injunctive class, or a 23(b)(3) damages subclass of California residents.

**First,** under settled Supreme Court precedent, an injunctive class should not be certified where there is no injunction that will provide a remedy to all class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."). Even the three named Plaintiffs and handful of potential class members who have been deposed disagree on a remedy. ACB concedes that an in-person check-in is appropriate; Davis and Vargas prefer a technological solution at the kiosk; Harden prefers to check-in at the front desk. As ACB's own 30(b)(6) witness testified: "No two people with a visual impairment need the same accommodation." (Ex. 35, at JA1092, JA1099-1100, Stanley Dep. at 22:21-22, 72:20-73:4.) Because no injunction forcing changes to the PSC kiosks will provide a remedy to all class members, Plaintiffs' request for a Rule 23(b)(2) class must be denied.

**Second**, as to Plaintiffs' proposed Rule 23(b)(3) damages subclass of California residents seeking minimum statutory damages under the Unruh Act and CDPA, common issues do not predominate and a class procedure is not superior. As courts in this circuit have explained, an ADA violation alone does not entitle a putativeclass member to statutory damages under California's disability laws. *See Vondersaar v. Starbucks Corp*., No. CV 12-05027 DDP AJWX, 2015 WL 629437,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

at *3 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018) ("each class member must show how he or she was personally affected and was denied full and equal access by the defendant."); *see also Moeller v. Taco Bell Corp.*, No. C 2–5849 PJH, 2012 WL 3070863 at *5 (N.D. Cal. Jul. 26, 2012); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000) ("[I]n order to maintain an action for damages under the Unruh Civil Rights Act, "an individual must take the additional step of establishing that he or she was denied access on a particular occasion.""). Here, the divergent experiences of the handful of witnesses on record demonstrate that Plaintiffs' claims cannot be addressed on a uniform, class-wide basis. As further detailed below, the individualized inquires in respect to show that various California class members' experiences with the check-in process prevent certification of Plaintiffs' proposed damages subclass.

### C. Class Requirements Of Rule 23(a)

#### 1. Numerosity

##### *a. Plaintiffs' argument on numerosity*

To establish the element of numerosity, courts throughout the Ninth Circuit allow class plaintiffs to rely on census information about the number of legally blind individuals in the country and the state, and then statistically apply that information to the class plaintiffs seek to designate. *National Federation of the Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1199 (N.D. Cal. 2007) ("Plaintiffs have submitted evidence, based on U.S. Census data, that there are likely thousands of potential class members in the nationwide class based on the large number of people who are legally blind and use screen access software.... Courts ... have repeatedly certified ADA classes like the one proposed here based on similar evidentiary showings."); *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 n. 8 (N.D.Cal.2004) ("[C]ensus data is frequently relied on by courts in determining the size of proposed classes."

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

(brackets omitted) (quoting 1 Robert Newberg, Newberg on Class Actions, § 3:3 (4th ed. 2002)).[9]

Here, Plaintiffs first offer the declaration of statistician Sean Chasworth on the question of numerosity. Chasworth is a data analyst who works in the areas of statistics and economics. (Ex. 27, at JA0721 [Chasworth report].) For the present case, Mr. Chasworth analyzed the U.S. Census Bureau data on the nationwide population of the legally blind as well as statistics from the National Institute of Health, and numerous national blind advocacy groups. (*Id.*, at JA0722-723.) He then analyzed data about populations of the areas which contain LabCorp PSCs, as well data from LabCorp's witnesses' testimony and documents as to the number of patients serviced per day, revenue and market share. (*Id.*, at JA0723-724.) This statistical analysis based on Census data showed there are *at least* 87,500 legally blind class members nationwide. (*Id.*, at JA0722.)

Mr. Chasworth then performed a similar analysis for the California subclass. He analyzed the 2019 American Community Survey reports and the NIH data to get the statistical rate of legal blindness in California. (*Id.*, at JA0725.) Mr. Chasworth then analyzed data about populations of the areas which contain LabCorp PSCs, and data from LabCorp's witnesses' testimony and documents as to the number of patients serviced per day in California, revenue, and market. (*Id.*, at JA0725-726.) This statistical analysis showed there are *at least* 8,861 legally blind class members in California. (*Id.*, at JA0722.) Plaintiffs easily meet the numerosity requirement.

Second, notwithstanding Mr. Chasworth's statistical analysis which easily satisfies Plaintiffs' burden on numerosity, LabCorp's survey responses over a five-week period in 2018 demonstrate it received over 60 complaints of persons with low or no vision having difficulty using the kiosk. LabCorp further has records

---

[9] This analysis also applies to the California minimum statutory damages class' damages claim, discussed in section V(B).



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

demonstrating over 130 complaints that individuals with low or no vision could not use the kiosk, across every division in the country. (Ex. 26, at JA0719-720 [LabCorp survey responses and blind user complaints.) Thus, LabCorp's own records easily satisfy the numerosity requirement given the law of this Circuit that "[t]he numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members." *Nevarez v. Forty Niners Football Company, LLC*, 326 F.R.D. 562, 576 (N.D. Cal. 2018).

***b. Defendant's argument on numerosity***

As to the proposed nationwide class, Labcorp does not dispute that there is a likelihood of at least forty instances nationwide of some legally blind individuals who might claim that they have had difficulty with using a kiosk for check-in, given the survey responses mentioned above. But, these persons were not denied **service**—the medical testing services PSCs provide—and therefore do not fit within Plaintiffs' class definition. In addition, Plaintiffs' expert offers numerosity opinions riddled with significant errors. (*See* Ex. 49, at JA1194-1204, Deal Rebuttal Rpt.) Thus, Plaintiffs have not satisfied numerosity, even as to the proposed nationwide class.

As to the California subclass, Plaintiffs fail to satisfy the numerosity requirements. They offer sworn evidence from only two California residents: Plaintiff Vargas, who was informed he would could check in with the front desk and who did so (*see* Ex. 13, at JA0158, JA0170-71, Vargas Dep. at 22:1-13; 34:4-35:6), and ACB member John Nuanes, the only California resident to respond to one of the over 4,000 survey requests sent out by ACB, who does not claim that he attempted to use the PSC kiosk or was told he needed to check in via the kiosk (*see* Ex.6, at JA00025, Nuanes Decl.). Neither California customer claims any personal interaction with the kiosk, neither asserts that his treatment was delayed, and both acknowledge that they were able to check in promptly and successfully. (Ex. 13, at



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JA0162-63, JA0165, Vargas Dep. at 26:18-27:22, 29:2-16; Ex.6, at JA0025.) Two California residents, neither of whom fall in Plaintiffs' class definition, do not satisfy numerosity. Moreover, the (inadmissible and unsworn) survey responses that Plaintiffs reference cannot satisfy the numerosity requirements for the California subclass. First, only twenty-three of the relevant survey responses came from California customers, and four of those responses praised the kiosks. (*See* Ex. 26, at JA0719-20). This leaves only 19 potential California class members identified in those responses, not all of which may be legally blind, which does not satisfy numerosity even when added to the other two Californians (Vargas and Nuanes).

Finally, Plaintiffs cannot show numerosity for a damages-based California subclass by relying on the report of their expert, Mr. Chasworth, whose methodology is speculative. (*See* Ex. 49, at JA1194-1204, Deal Rebuttal Rpt.) Mr. Chasworth hypothesizes that at least 8,861 legally blind Californians annually would have been denied access to Labcorp services as a result of its use of kiosks. However, Mr. Chasworth concedes that his speculative analysis does not: (1) identify the number of California people who are actually legally blind; (2) identify the number of blind people who actually visited a Labcorp PSC containing a working kiosk; or (3) identify the number of blind people who opted to use the kiosk to check in. *See* Part I.B.3 above. These are not just hypothetical flaws. (*See* Ex. 49, at JA1194-1204, Deal Rebuttal Rpt.) Moreover, without a methodology to actually identify legally blind patients ***who attempted to use Labcorp's check-in kiosks***, Mr. Chasworth cannot opine on the number of persons within Plaintiffs' class definition.

Mr. Chasworth's flawed methodology fails entirely to meet the standards for reliable expert testimony required in federal courts at the class certification stage. *See Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011) (holding that on a motion for class certification, courts apply *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993) to expert testimony). As the *Ellis* Court explained,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

when expert testimony is offered in the class certification context, the trial court must act as a "gatekeeper" to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards. *Id.* That standard was not met here, where Mr. Chasworth's estimate of anywhere from 1,575 to 112,400 putative California subclass members annually is based on flawed assumptions and inconsistent methodologies. (*See* Ex. 49, Deal Rebuttal Rpt., JA1194-1204.)

Importantly, Plaintiffs had full opportunity to attempt to find putative California subclass members and not to rely almost exclusively on their expert: as detailed in Part II.B.2 above, Plaintiff ACB sent out surveys to over 4,200 of its members asking for experiences with Labcorp PSC kiosks, but received only 12 responses nationwide and just one from a California resident. In the end, Plaintiffs mustered only one declaration from a California resident (Mr. Nuanes) to join Mr. Vargas's California-based class. In such circumstances, courts refuse to speculate and accept statistical speculation. *See Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 550 (N.D. Cal. 2007) (no numerosity where plaintiff relied on statistics about number of disabled persons and popularity of golfing), citing *Green v. Borg–Warner Protective Servs. Corp., No. 95 CIV. 10419 (RPP)*, 1998 WL 17719, *3–4, (S.D.N.Y. Jan. 15, 1998) (fact that four thousand single adult men and women reside in shelters on any given day, along with some reports of assault and misconduct at shelters, does not establish numerosity).

Thus, Plaintiffs have not met their burden of showing that they have met Rule 23(a)'s numerosity requirement.

**2. Commonality**

***a. Plaintiffs' argument on commonality***

To fulfill the commonality prerequisite of Rule 23(a)(2), plaintiff must establish there are questions of law or fact common to the class and that "'class members have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). "So long as there is 'even a single common

question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2) … Thus, '[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.'" *Parson v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (citations omitted).

Here, several of the core legal and factual questions will not vary from class member to class member but will rather "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. The common questions presented here include, *inter alia*, whether:

- LabCorp's kiosks are independently accessible to legally blind individuals;
- LabCorp has implemented the inaccessible check-in kiosks system across its national network of more than 1,800 PSCs;
- LabCorp trained its employees that use of the kiosks to check-in was mandatory;
- Use of the kiosk is a good or service LabCorp offers its customers;
- LabCorp offers a qualified aid or auxiliary service to allow legally blind individuals to access the check-in kiosk service; and
- LabCorp has remedied the inaccessible check-in kiosk across its system.

Accordingly, Rule 23(b)(3)'s commonality requirement is satisfied.

***b. Defendant's argument on commonality***

Labcorp does not dispute that there is at least one common question of law at issue here. However, as to the Rule 23(b)(2) class, the Supreme Court has cautioned that the commonality must be found in a common ***remedy***. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.") (emphasis in original). As the Court explained: "The key



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (internal citations and quotations omitted). As further detailed below in Labcorp's section on 23(b)(2) factors, the evidence before the Court shows that no such common injunction or declaration will provide relief here. Thus, Plaintiff's proposed injunctive relief class should not be certified.

Further as to the Rule 23(b)(3) California damages subclass, common issues do not predominate, as will be further detailed in the predominance section below.

### 3. Typicality

#### *a. Plaintiffs' argument on typicality*

Rule 23(a)(3) requires the claims of the representative plaintiff must be typical of the claims of the class. "Typicality focuses on the class representative's claim – but not the specific facts from which the claim arose – and ensures that the interest of the class representative 'aligns with the interests of the class.' The requirement is permissive, such that 'representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted).

Here, the individual plaintiffs have the exact same claims as absent class members. Both Mr. Vargas and Mr. Davis are legally blind. (Ex. 13, at JA0150:12-22 [Vargas deposition]; Ex. 14, at JA0228:18-23 [Davis deposition].) Both visited LabCorp's PSCs during the Class Period. (Ex. 13, at JA0160:21-161:2; JA0165:2-16 [Vargas deposition]; Ex. 14, at JA0254:14-24, JA0272:8-20, JA0257:6-13 [Davis deposition].) Both have encountered difficulty from the failure to independently access LabCorp's kiosks. (*Id.*)

In most access cases, there will be individual variations among class members in terms of the nature of their disability, the types of aides used, and the individual





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

nature of each class member's encounters with the accommodation and access to services and facilities. But this does not defeat typicality. *See, e.g., Moeller*, 220 F.R.D. at 611 (finding typicality satisfied where proposed class used different types of mobility aides but experienced the same "effect of these alleged barriers and policies"). The class representatives are a part of the class, possess the same interests at the class, and suffered the same injury as the class. They therefore easily satisfy the typicality requirement.

***b. Defendant's argument on typicality***

The typicality requirement assures that the interest of the named representative aligns with the interests of the class. *See Ellis*, 657 F.3d at 984-85. While Mr. Vargas and Mr. Davis state that they would both **prefer** to use screenreader software and VoiceOver technology at the check-in kiosk to check in for Labcorp sample collection services (and both assert that such technologies would enable them to check in independently), Plaintiffs have failed to provide sufficient evidence that their own preference is typical for all the legally blind individuals they seek to represent, or that proposed class members suffered any injury related to inability to check-in on the kiosk. Indeed, ACB's representative testified that front-desk check in was a preferred option for blind patrons. (*See* Ex. 35, at JA1101, Stanley Dep. at 78:6-9.)

Plaintiffs did little to prepare evidence that their own preferences in regard to check-in kiosks are typical of those of other legally blind persons; indeed, while ACB has a 20,000 person membership, it only located twelve members who had visited a PSC—and then only six of those provided declarations in support of class certification that are cookie-cutter, short statements in which no declarant claims (like Mr. Davis) to have been forced to use a kiosk for check in, and in which no declarant claims (like Mr. Vargas) to have been left waiting several minutes during check-in. (*See* Exs. 5-10, at JA0024-29.) And tellingly, Plaintiffs omitted from their discussion the ACB survey response and testimony from Mr. Harden, who

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

explained that while he knows about the kiosks, he prefers to and does check in at the front desk of his local Labcorp PSC at his quarterly visits. (Ex. 36, at JA1110-11, Harden Dep. at 29:19-30:16.) Moreover, Plaintiffs brush past Ms. VanLant's testimony that she visited a PSC several times and checked in at the front desk without any knowledge there was a check-in kiosk at all, until a 2019 visit when her husband saw it and told her it existed. (Ex. 37, at JA1114, Van Lant Dep. at 41:11-16.)

However, Plaintiff Vargas and two other ACB members used front desk check-in and testified that they have never been instructed by PSC staff to use a kiosk to check in. (*See* Ex. 13, at JA0158, JA0162-63, JA0173-74, Vargas Dep. at 22:14-19, 26:18-27:22, 37:13-38:6; Ex. 36, at JA1104, JA1108-09, Harden Dep. at 19:6-24, 25:25-26:2; Ex. 37, at JA1113, Van Lant Dep. at 35:11-16.) Plaintiff Davis also testified that since 2019 he has checked in using the mobile app before arriving at a PSC. (Ex. 14, at JA0272-73, Davis Dep. at 59:17-60:3). Thus, testimony from Mr. Harden evidences that there could be many legally blind persons who prefer to be checked in at the front desk, and have never tried to use a kiosk; testimony from Mr. Davis indicates there could be many legally blind persons who have checked in before arriving and have no need for on-site; and testimony from Ms. VanLant indicates that there could be many legally blind persons who may have been unaware of the kiosk entirely during various visits when checking in at the front desk, and did not try to use it. Such testimony cuts strongly against claims of typicality.

The Supreme Court has "repeatedly held that a class representative must be part of the class *and possess the same interest and suffer the same injury* as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (emphasis added, internal citation omitted). Here, the proposed class of legally blind persons cannot be presumed to have the same experience as Plaintiffs, given Mr. Harden's testimony, the wide discrepancies in PSC staffing, the slow roll-out of PSCs, the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

24.5% usage of the front desk for check-ins, the fact that 19 California PSCs still have no kiosk, the fact that there are times when kiosks are not operational, and similar facts detailed in Part II.B.1-2 above. And when Plaintiffs' own expert, and ACB's representative, have both conceded that Plaintiffs' requested injunctive relief in the form technical changes to the kiosks would not make that check-in option fully accessible to all legally blind persons (*see* Part II.B.1 and 4 above), there is no typicality.

When Plaintiff ACB's representative, Claire Stanley, was questioned about Mr. Harden's survey response (in which he explained he was happy with the PSC's front desk check-in option), she explained that she discounted his response because it did not fit within Plaintiffs' preferred narrative. (Ex. 35, at JA1095-96, Stanley Dep., 50:12-51:5.)[10] But when Plaintiffs seek to impose their own technological preferences on an entire class membership, and when those interests could be adverse to those of the class members who (like Mr. Harden) could well wish to continue to have front desk check-in with a qualified reader remain the preferred auxiliary aid for legal blindness, they have not met Rule 23(a)'s typicality requirement.[11]

**4. Adequacy**

***a. Plaintiffs' argument on adequacy***

Rule 23(a)(4) requires the representative plaintiff to protect the interests of the

[10] ACB's representative acknowledged that if Labcorp allows patients to check in at the front desk **it would not be discriminatory** (*id.* at 57:19-23), but believes that Labcorp **requires** all patients to use the kiosk to announce their arrival and sign in (*id.* at 60:10-15)—a belief not supported by Labcorp's policies or by the experiences of Plaintiff Vargas, Mr. Harden, or Ms. VanLant. *See* Parts II.B.1-2 above.

[11] The Supreme Court's upcoming *TransUnion* ruling could also provide additional guidance on typicality requirements under Rule 23(a); if such guidance does issue in the opinion expected later this term, Labcorp will alert the Court.



NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

class fairly and adequately. To satisfy constitutional due process concerns, unnamed class members must be afforded adequate representation before entry of a judgment which binds them. See *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Plaintiffs and their counsel meet both requirements here. There are no conflicts with other class members and the named individual Plaintiffs, and their counsel have been prosecuting this action vigorously on behalf of the class and are very experienced in both accessibility and class action litigation generally. (*See*, Ex. 2, at JA0007-11 [Miller declaration, ¶¶ 15-19]; Ex. 3, at JA0014-16 [Hanley declaration]; Ex. 13, at JA0203:21-207:8 [Vargas deposition]; Ex. 14, at JA0336:7-340:23 [Davis deposition].) In addition, in contrast to many plaintiff's class action law firms, here proposed class counsel has ample experience in taking civil rights cases such as this to verdict successfully. (Ex. 2, at JA00010-11 [Miller declaration, ¶ 19].) Accordingly, adequacy is satisfied.

***b. Defendant's argument on adequacy***

Defendant does not challenge Plaintiffs' counsel on adequacy grounds, but as to Plaintiffs' own adequacy, incorporates its challenges to Plaintiffs' typicality already asserted above. As another federal court found, when assessing a different ADA class claim brought by Plaintiffs' same counsel here, plaintiffs are not adequate if class members may have had different experiences with accessibility, and where a single injunction could not resolve all issues. *See Mielo v. Bob Evans Farms, Inc.*, No. CIV.A. 14-1036, 2015 WL 1299815, at *11 (W.D. Pa. Mar. 23, 2015) (adequacy requirements not met for a proposed Rule 23(b)(2) injunctive class where "[plaintiff's] claims conflict with those of other class members who may not

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

have suffered any injury. . . .")

**D. Class Requirements of Rule 23(b)(2) for Injunctive Class**

***1. Plaintiffs' argument on Rule 23(b)(2) requirements***

Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds generally applicable to the class," thereby making injunctive relief appropriate. Fed.R.Civ.P. 23(b)(2). Class actions certified under Rule 23(b)(2) are "not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages" where the claim for injunctive relief is the primary claim. *Probe v. State Teachers' Ret. Sys*., 780 F.2d 776, 780 (9th Cir.1986). Here, while Plaintiffs seek statutory damages on behalf of the California minimum statutory damages class, the primary relief Plaintiffs seek is injunctive. (*See, e.g.*, Ex. 13, at JA0204:2-15, JA0206:2-15 [Vargas deposition]; Ex. 14, at JA0337:21-338:3, JA0340:20-23 [Davis deposition].)

For the purposes of Rule 23(b)(2), Plaintiffs have sufficiently established LabCorp's actions with respect to the accessibility of its check-in process are "generally applicable to the class." Fed. R. Civ. Proc. 23(b)(2). LabCorp's corporate witness and documents reflect that the kiosks are in nearly every LabCorp patient service center nationwide, that staff is frequently not available to help check-in, and that use of the kiosks is "mandatory." (Ex. 12, at JA0061:23-64:14, JA0122 (use of kiosk "not optional") [Sinning deposition]; Ex. 20, at JA0518:5-523:17, JA0524:8-15 [Coan deposition].) Putative class members continue to encounter difficulties using the electronic check-in service. These barriers impact all legally blind users and, therefore, the check-in accessibility barriers identified by plaintiffs are generally applicable to the class. Accordingly, an injunctive relief class is appropriate.

***2. Defendant's argument on Rule 23(b)(2) requirements***

The Supreme Court has cautioned that the commonality must be found in a common remedy. *See Wal-Mart Stores*, 564 U.S. at 360 ("In other words, Rule





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."); *see also Meilo*, 2015 WL 1299815, at *12 (denying 23(b)(2) certification where "[Defendant's] conduct is not such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them, nor can it answer the common question in one stroke."). Here, even the three named Plaintiffs do not agree on the appropriate accommodation, and there certainly is not single injunction that will provide relief to each member of the class.

Plaintiff ACB, the advocate for over 20,000 members, acknowledges that the injunction Plaintiffs seek would not provide relief to each member of the class:

> Q: Is providing speech output, will that resolve the accessibility concerns of everyone that is blind or visually impaired?
>
> A: No one accommodation is going to accommodate every person everywhere.
>
> Q: Okay. Because everyone has different levels of impairment and different comfort levels with the technology that might be offered to accommodate their disability, correct?
>
> A: Correct.

(Ex. 35, at JA1099-1100, Stanley Dep. at 72:20-73:4.) Plaintiffs' accessibility expert testified similarly, acknowledging that Plaintiffs' proposed technological changes would not create the "full and equal enjoyment" of the check-in kiosks to which Plaintiffs claim legally blind persons are entitled. (Ex. 38, at JA1116-17 Montgomery Dep. at 106:3-17; 109:12-21.) This is the precise reason why Labcorp retained and improved the front desk check-in process, because no improvement to a kiosk would make it useable for all blind persons.

Classwide injunctive relief is not appropriate when there would not be a single injunction or declaration that could satisfy all potential class members. *See Wal*-Mart, 564 U.S. at 360. Plaintiffs have not articulated an injunctive or declaratory remedy that could make the check-in kiosks fully accessible to legally





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

blind persons. Further, the record evidence supports that accommodating blind patients' check-in requirements through Plaintiffs' desired technology additions cannot provide relief on a class-wide basis. While Plaintiffs Davis and Vargas and some ACB plaintiffs favor a technological solution involving screenreaders, VoiceOver software, or both (*see* Part II.B.2), Mr. Harden explained that he is totally blind, visits a Labcorp PSC every three months, and prefers checking in the front desk, as does his wife, who is also blind. *See id.* In fact, roughly twenty-five percent of Labcorp's PSC patients (blind or sighted) check in at the front desk, rather than the kiosk. *Id.* And Plaintiff ACB testified that an in-person front desk check-in is a preferred method. (Ex. 35, at JA1101, Stanley Dep. at 78:6-9.) In ACB's words, "No two people with a visual impairment need the same accommodation." (*Id.*, at JA1092-93, *id.* at 22:21-22.)

Thus, even if Plaintiffs' individual claims survive summary judgment (which they should not), their proposed injunctive relief class should not be certified.

### E. Class Requirements of Rule 23(b)(3) for California Minimum Statutory Damages Class

#### 1. Common questions of law and fact predominate over individual questions

##### *a. Plaintiffs' argument on predominance*

Certification of a minimum statutory damages class pursuant to Rule 23(b)(3) requires common issues to predominate over individual issues. *See* Fed. R. Civ. P. 23(b)(3). As Plaintiffs only seek a minimum statutory damages class for California residents under California state law, the predominance inquiry affects only the California minimum statutory damages class.

The Ninth Circuit has consistently "held that 'there is a clear justification for handling the dispute on a representative rather than on an individual basis' if 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Mazza v. Am. Honda Motor*

*Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 2011).

First, here Plaintiffs seek minimum statutory damages only for the California state law claims on behalf of the putative California minimum statutory damages class. The damages Plaintiffs seek on behalf of the California class are the minimum statutory damages, a fixed amount per offense. (Dkt. 40, Prayer for Relief, subs. (d) [FAC].) Plaintiffs do not seek any actual or compensatory damages. (Ex. 13, at JA0204:2-15, JA0206:2-15 [Vargas deposition]; Ex. 14, at JA0337:21-338:3, JA0340:20-23 [Davis deposition].) Importantly, the Ninth Circuit has held "[t]he litigant need not prove that she suffered actual damages to recover the independent statutory damages of $4,000." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). Thus, each member of the California minimum statutory damages class has a similar interest in the common adjudication of the claim. According to the report of Plaintiffs' expert Sean Chasworth, total damages for the California minimum statutory damages class are at the very least $35,444,000 per year (and very possibly much greater), representing a statutory penalty of $4,000 per access violation suffered by California class members (and continuing to accrue as the inaccessible kiosk remains at all LabCorp PSC locations). (Ex. 27, at JA0722 [Chasworth report].) Accordingly, there are no individualized damages issues that predominate over the issues common to the class.

Second, the proposed minimum statutory damages class satisfies the Ninth Circuit's requirements that the damages "are directly attributable to their legal theory of harm," and that they can be "determined without excessive difficulty." *Just Film*, 847 F.3d at 1121. Again, because the damages are simply determines based on the California class size, and then multiplying that by the statutory penalty, the damages do not require complicated calculations.

Finally, should the need arise for class members to confirm eligibility to recover statutory damages under the Unruh Act, it is well-settled that this issue may properly be addressed by way of a claim form after class wide liability has been

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

determined. *See, e.g., Target*, 582 F.Supp.2d at 1203, 1209; see also, *Brooks v. Pressed Juicery, Inc.*, 336 F.R.D. 484, 493 (E.D. Cal. 2020) (allowing class notice via publication in a website accessibility class on behalf of legal blind California residents seeking statutory Unruh damages). Predominance is therefore satisfied.

***b. Defendant's argument on predominance***

Rule 23(b) predominance "is far more demanding" than Rule 23(a) commonality. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Certification must be denied if an "individualized inquiry" must proceed, even if "other issues [are] susceptible to common proof." *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944-47 (9th Cir. 2009).

To recover statutory damages under the Unruh Act, a class member must show they "personally encountered" an Unruh Act violation that caused them difficulty, discomfort, or embarrassment. *See, e.g., Doran v. 7-Eleven, Inc.*, 509 F. App'x 647, 648 (9th Cir. 2013) (affirming denial of statutory damages under the Unruh Act because the plaintiff did not prove he personally encountered violation and experienced difficulty, discomfort, or embarrassment). *See also Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000) ("[I]n order to maintain an action for damages under the Unruh Civil Rights Act, an individual must take the additional step of establishing that he or she was denied access on a particular occasion."). Similarly, "California courts have held that to maintain an action under the CDPA, a plaintiff must establish that he or she was denied equal access to a public facility on a particular occasion." *Moeller v. Taco Bell Corp.*, No. C 02-5849 PJH, 2012 WL 3070863, at *4 (N.D. Cal. July 26, 2012), citing *Donald v. Café Royale, Inc.*, 218 Cal.App.3d 168, 183 (1990).

Here, Plaintiff Vargas seeks to represent a subclass of California legally blind persons who (like him) were unable to check in at Labcorp's kiosks, and thus checked in at the front desk. But even if Vargas argued that checking in at the front desk caused him difficulty, discomfort, or embarrassment, his own experience

cannot be imputed to other California residents who are legally blind. Not all California PSC's even have kiosks (*see* Ex. 32, at JA1064, Sinning Dep. at 40:3-12), and for those that do, staffing varies widely depending on location and a PSC's size: some locations have a dedicated patient intake representative ("PIR") who sits full time at the front desk to check in patients; others have phlebotomists to conduct both check in and testing; and some PSCs are located inside Walgreens stores where there is always a dedicated Walgreens staff member to assist patients. (*Id.*, at JA1067-68, JA1069-70 *id.* at 47:22-48:4, 78:3-8; 79:12-21.) Moreover, upwards of 10% of PSC patients check-in online before arriving at the PSC. (Ex. 48, at JA1191, Deal Rpt., Exhibit 4.)

When such individualized experiences abound, courts in this circuit have denied certification of damages classes seeking statutory damages premised on alleged ADA violations. *See, e.g., Vondersaar v. Starbucks Corp*., No. CV 12-05027 DDP AJWX, 2015 WL 629437, at *4 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018) (denying certification of Unruh damages class because "each class member must show how he or she was personally affected and was denied full and equal access by the defendant."), *aff'd Vondersaar v. Starbucks Corp*., 719 F. App'x 657, 659 (9th Cir. 2018) ("class-wide issues do not predominate over the numerous individual questions posed by plaintiffs' Unruh Act claims, including whether a class member is disabled, which Starbucks store or stores he visited, how many visits he made, . . .and whether the class member was actually denied full and equal access."). *See also Moeller*, 2012 WL 3070863, at *14 (individual questions to assess availability of statutory damages would predominate).

As the *Moeller* Court explained, "damages for California disability claims are inextricably intertwined with individualized liability questions, and it is thus impossible to make an across-the-board conclusion as to the recovery of damages by any class member. An individual class member's claim for damages cannot be





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

adjudicated simply by demonstrating the mere presence of an alleged non-compliant feature. Each class member must show how he or she was personally affected and was denied full and equal access by the defendant." *Id.* at *5. *See also Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 6–cv–2671 BTM, 2012 WL 3762440 at *5–6 & n.1 (S.D. Cal. Aug. 28, 2012) (denying class certification of damages class where determination of statutory damages required individualized evidence of each California customer's experience).

Further, the required showings of "eligibility for statutory damages" are not something that can "be addressed by way of a claim form after class wide liability has been determined," as Plaintiffs contend above. *Id.* Plaintiffs cite only two cases for the purported proposition that claim forms can be used to gather the required information from class members as to how much each is owed in statutory damages. Neither case involved a Rule 23(b)(3) damages class in which class members opting to stay in the class had to establish that they were personally affected by an ADA violation to be entitled to damages.

Plaintiff first offers *National Federation of the Blind v. Target Corp*, which involved only **Rule 23(b)(2) classes**, and issued years before the Supreme Court (in *Wal-Mart v. Dukes*) held that money damages claims could not be certified under Rule 23(b)(2) in such circumstances. *See Nat'l Fed. Of Blind v. Target Corp*, 582 F.Supp.2d 1185, 1203 (N.D. Cal. 2007) (certifying **both** the nationwide injunctive relief class and the California subclass seeking statutory damages under Rule 23(b)(2)). Thus, there was no predominance inquiry in *Target*, and more importantly, no acknowledgment of the California case law—recognized by *Vondersaar*, *Moeller*, and *Atoninetti*—establishing that eligibility for minimum statutory damages under California disability laws depends on individualized proof.

Second, Plaintiffs rely on *Brooks v. Pressed Juicery, Inc.*, 336 F.R.D. 484, 493 (E.D. Cal. 2020), arguing that the court "allow[ed] class notice via publication in a website accessibility class on behalf of legal blind California residents seeking

statutory Unruh damages,.”. But *Brooks*, like *Target*, was considering only a **Rule 23(b)(2) class**—this time, a settlement class—which makes the notice analysis very different: the *Brooks* court allowed class notice to be published to let class members know that the named plaintiff was getting $2,500, the class counsel was getting $35,000, and the defendant was going to make its website more accessible. *See id.* at 492-93. *Brooks* did not address certification under Rule 23(b)(3) and the *Brooks* court did not opine that predominance concerns about individual damages claims could be alleviated through publication notice.

### 2. Class certification is superior to other means of resolving this dispute

#### *a. Plaintiffs' argument on superiority*

Plaintiffs here satisfy each of the Rule 23(b)(3) superiority factors, including: (1) the class members' interests individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action.

First, there is no indication in the record that class members have an interest in individually controlling their own cases, as the cost of litigation would be prohibitive. *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Second, Plaintiffs are aware of only one other case regarding the accessibility of LabCorp's kiosk. (Ex. 26, at JA0715-718 [LabCorp's document production].) That case is not a nationwide class action and does not seek a modification of LabCorp's entire Express kiosk network. (*Id.*) Third, this forum is desirable because California is home to 299 PSCs – more than any other U.S. state. It is also the home of proposed lead plaintiff Julian Vargas. Finally, this class action does not present any unique difficulties that might render it difficult to manage. It will, in fact, involve a garden variety application of the Rule 23 mechanism. Plaintiffs will establish both

liability and minimum statutory damages by common proof. Accordingly, the class action device is the superior method for adjudicating this nationwide civil rights suit.

### *2. Defendant's argument on superiority*

Two of the decisions already discussed in Labcorp's predominance section above also found that class procedures were not superior for adjudicating Unruh/CPDA claims in a Rule 23(b)(3) class, considering the individualized issues involved in assessing damages and the hefty per-claimant minimum statutory damages amounts incentivizing lawsuits. Indeed, in *Antoninetti*, the court opined that given the significant statutory damages available for individual claims, and given the individualized inquires involved in determining whether damages awards were available,"the Court sees no advantage with respect to judicial economy in certifying the issue of whether putative class members are entitled to statutory damages under the Unruh Act. Nor does the Court find that the availability of a class action is necessary to enforce the Unruh Act in this context. . . . . Accordingly, the Court finds that a class action would not be superior to other available methods for fairly and efficiently adjudicating this controversy, and declines to certify a damages class." *Id.*, 2012 WL 3762440, at *6–7. The *Moeller* court reached the same result. *See Moeller*, 2012 WL 3070863, at *5 ("certifying a(b)(3) class for the issue of damages would not constitute a superior method for adjudicating the controversy.").

For these same reasons, class procedures are not superior here. Nor would a class be manageable. Thus far, Plaintiffs have offered supposition that somewhere between 1,575 and 112,400 legally blind Californians are in the California sub-class. (*See* Ex. 27, at JA0727, Chasworth Report; *see* Ex. 49, JA1194-1204, Deal Rebuttal Rpt.) Plaintiffs have not indicated how they would locate those class members, other than to mention publication notices allowed in two Rule 23(b)(2) cases, where notice is very different because there is no need to provide class members the opportunity to opt-out, as is the case in Rule 23(b)(3) actions.





NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

There is no allegation (nor could there be) that Labcorp has records that would indicate which patients qualify as legally blind out of the California patients who have checked in at one of its hundreds of California PSCs during the class period. Here, Plaintiffs' expert posited that the California statutory damages subclass alone would involve **at least** 8,861 persons and $35,444,000 in Unruh statutory damages **per year**, plus $8,861,000 in CDPA statutory damages **per year** – but he also posited that there could also be over 12.6 times that number of class member per year (*see* JA0727), which would raise classwide statutory damages to over $554 million **per year**. But guesswork as to potential class sizes does nothing to locate actual class members who could potentially – based on an individualized showing – demonstrate an entitlement to statutory damages.

There is not even evidence of 40 Californians who could be class members (see Part C.1.b above), and even Plaintiff ACB does not know which of its own 20,000 members qualify as legally blind (*see* Ex. 35, at JA1090-91, Stanley Dep. at 20:24-21:8), let alone which ones (other than the 12 members identified) visited a Labcorp facility at all or which could establish an entitlement to statutory damages. (*Id.*, at JA1093-94, *id.* at 26:24-27:9.) Nonetheless, Plaintiffs may point to one recent Unruh Act class action decision in which a Northern District court did find that a class procedure would be superior for adjudicating California disability claims tied to an accessibility issues for a football stadium. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 586 (N.D. Cal. 2018). But the *Nevarez* court found that class members could be easily located and their claims managed, because the single stadium at issue had sold ADA accessible seating and had the contact information for the purchasers, so that the 3,400 purchasers of accessible seating could be ascertained. *Id.* The *Nevarez* court specifically distinguished *Moeller* (involving California Taco Bells) and *Antoninetti* (involving California Chipoltles), where those defendants had no information helpful to identifying a disability claims class. *Id.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Labcorp has no information (other than the 23 survey responses discussed above) on what legally blind or visually disabled Californians may have visited one of its 299 California PSCs at all during the class period, or whether there was a working kiosk available that a legally blind person tried to access. Moreover, individual harm required for CDPA and Unruh claims would need to be assessed individually for each subclass member. Thus, as the courts found in *Antoninetti* and *Moeller*, a Rule 23(b)(3) class is not superior or manageable.

## IV. CONCLUSION

### *A. Plaintiffs' Conclusion*

For the reasons stated herein, Plaintiffs respectfully request that their motion for class certification be granted.

### *B. Defendant's Conclusion*

The Court should not certify Plaintiffs' proposed nationwide class, or California subclass, for the reasons detailed above.

Dated: April 26, 2021

Respectfully submitted,

By: */s/ Jonathan D. Miller*

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(*admitted pro hac vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matthew K. Handley
(*admitted pro hac vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th St NW
Washington, DC 20001
Telephone: (202) 559-2411
Facsimile: (844) 300-1952

Dated: April 26, 2021

By: */s/ Becca Wahlquist*

Becca Wahlquist (State Bar No. 215948)
bwahlquist@kelleydrye.com
Tahir L. Boykins (State Bar No. 323441)
tboykins@kelleydrye.com
KELLEY DRYE & WARREN LLP
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 712-6100

Robert Steiner (*admitted pro hac vice*)
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800

*Attorneys for Defendant Laboratory Corporation of America Holdings*

**SIGNATURE ATTESTATION**

I hereby attest that all signatories listed above, on whose behalf this stipulation is submitted, concur in the filing's content, and have authorized the filing.

Dated: April 26, 2021

By: */s/ Jonathan D. Miller*
Jonathan D. Miller (SBN 220848)

*Attorneys for Plaintiffs*